1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                          **CENTRAL DISTRICT OF CALIFORNIA**

10

11   MARIE VICTORIA SALINAS,              No. EDCV 13-01329 SS

12                  Plaintiff,

13        v.                              **MEMORANDUM DECISION AND ORDER**

14   CAROLYN W. COLVIN,
     Acting Commissioner of the
15   Social Security Administration,

16                  Defendant.

17

18

19                                   **I.**

20                              **INTRODUCTION**

21

22        Marie  Victoria  Salinas  ("Plaintiff")  seeks  review  of  the

23   final  decision  of  the  Commissioner  of  the  Social  Security

24   Administration (the "Commissioner" or the "Agency") denying her

25   Disability  Insurance  Benefits  and  Supplemental  Security  Income.

26   The  parties  consented,  pursuant  to  28  U.S.C.  §  636(c),  to  the

27   jurisdiction  of  the  undersigned  United  States

28   Magistrate  Judge.   For  the  reasons  stated  below,  the  decision  of

the Commissioner is REVERSED and the action is REMANDED for an award of benefits consistent with this decision.

## II.

### PROCEDURAL HISTORY

Plaintiff filed applications for Title II Disability Insurance Benefits ("DIB") and Title XVI Supplemental Security Income ("SSI") on July 16, 2009. (Administrative Record ("AR") 109, 113). She alleged a disability onset date of July 1, 2008. (AR 134). The Agency denied Plaintiff's applications on November 12, 2009 and, upon reconsideration, on February 18, 2010. (AR 49, 57). On March 16, 2010, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 64). Plaintiff testified before the first of two ALJs, Sharilyn Hopson ("First ALJ"), on March 21, 2011.[1] (AR 26-44). On May 20, 2011, the First ALJ issued a decision denying DIB and SSI. (AR 12-22).

Plaintiff timely filed a Request for Review of the First ALJ's unfavorable decision (AR 6), which the Appeals Council denied on October 21, 2011. (AR 1). Plaintiff then filed an action with this Court on December 15, 2011. (Case No. EDCV 11-01924 SS; AR 426-27). Following a stipulation for voluntary remand (AR 404-05), the Court entered an Order and Judgment for Remand on July 16, 2012. (AR 402-03). The stipulation directed

---

[1]   Plaintiff ultimately appeared before two different ALJs, identified here as "First ALJ" and "Second ALJ." The related proceedings are identified as "First ALJ Hearing" and "Second ALJ Hearing."

2

1    the ALJ to reevaluate the credibility of Plaintiff's subjective

2    complaints and to give further consideration to the Third Party

3    Function Report of Carlos Marroquin, who was described as

4    Plaintiff's boyfriend.  (AR 404-05).  The order also directed the

5    ALJ to "reconsider Plaintiff's residual functional capacity,

6    obtain vocational expert testimony, and issue a new

7    administrative decision."  (AR 405).

8

9        On September 24, 2012, the Appeals Council vacated the First

10   ALJ's decision and remanded the case.  (AR 397-400).  The Appeals

11   Council order required the Second ALJ to: (1) further evaluate

12   Plaintiff's subjective complaints; (2) "give consideration to the

13   third party other source statements"; (3) give additional

14   consideration to Plaintiff's residual functional capacity (RFC)

15   in light of evidence on the record; and (4) obtain evidence from

16   a vocational expert (VE) as to Plaintiff's job prospects in light

17   of her assessed limitations.  (AR 400).

18

19       Plaintiff testified before the Second ALJ, Margaret Craig,

20   on March 27, 2013.  (AR 348-96).  On April 5, 2013, the Second

21   ALJ issued an unfavorable decision.  (AR 323-40).  On August 9,

22   2013, Plaintiff filed the instant Complaint (Dkt. No. 3).

23   \\

24   \\

25   \\

26

27

28

3

III.

**FACTUAL BACKGROUND**

Plaintiff was born on December 30, 1959. (AR 109). She was forty-nine years old as of the alleged disability onset date, fifty-one years old at the time of her hearing before the First ALJ, and fifty-three years old at the time of her hearing before the Second ALJ. (AR 113, 26, 346). She is a high school graduate with some college education. (AR 34). Plaintiff alleges that her ailments became severe enough to prevent her from working on or about July 1, 2008, although she had experienced pain beginning at an unspecified earlier date.[2] (AR 126). Plaintiff had also been diagnosed previously with diabetes. (AR 39). Plaintiff worked as a teacher's aide before her ailments became severe enough to prevent her from working. (AR 30). Plaintiff told the First ALJ she was on her way to work on the alleged onset date when she suffered a "complete breakdown," which her physician initially diagnosed as an anxiety attack. (AR 30-31). She testified that she sought treatment that same day. (AR 31). Plaintiff attributed the cause of her ceasing work to depression along with ongoing hand and neck pain, headache, and nausea. (AR 30).

---

[2]   The Agency's Application Summary records Plaintiff as stating that she became unable to work on July 1, 2008. (AR 109). However, in the Work Activity Report filed with her application, Plaintiff stated that her impairments "did not affect my work until I had to stop July 2008 (sic)." (AR 123). It appears that the Agency recorded July 1, 2008 as Plaintiff's last day of work for the sake of convenience, after concluding that "[n]o earlier alleged onset date appeared possible." (AR 126).

**A.   Medical History And Treating Doctors' Opinions**

     **1.   Physical Condition**

       a.   Dr. Maged Samaan

Plaintiff first saw her primary care physician, Maged Samaan, D.O., on October 18, 2004.  (AR 248).  The record indicates that on March 15, 2006, Dr. Samaan or a colleague doubled Plaintiff's preexisting dosage of Klonopin, an anti-seizure drug also commonly prescribed to relieve anxiety.[3]  (AR 241).  A note from November 12, 2006 refers to Glyburide and Avandia, two drugs typically prescribed for diabetes, and Lexapro, which is typically prescribed for anxiety and depression.[4]  (AR 238).  The first treatment note in the Administrative Record that is dated on or after Plaintiff's alleged onset date appears to be that of November 24, 2008, nearly five months later.[5]  (AR 232).

\\

\\

_____

[3]   _see_ Clonazepam, MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682279.html (last visited Sept. 22, 2014)).

[4]   _See_ Glyburide, Rosiglitazone, and Escitalopram, MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/druginfo/meds/ (locate "Browse by generic or brand name" and click first letter of drug name) (last visited Sept. 22, 2014)).

[5]   This evidence varies from Plaintiff's testimony that she sought treatment on the alleged onset date (AR 31) or "immediately" (AR 358).  However, it is possible that Plaintiff initially sought treatment from another physician or that the AR is incomplete as to all of her visits with Dr. Samaan.

1     The results of several tests ordered by Dr. Samaan are more
2  readily interpreted.   An x-ray taken on May 3, 2009 showed that
3  Plaintiff's wrist was in normal condition.   (AR 305).   An "NC-
4  stat" test conducted on October 7, 2009 measured nerve function
5  in Plaintiff's upper extremities and found "[r]ight median nerve
6  conduction" within normal limits.   (AR 309).   An x-ray series on
7  June 3, 2010 found Plaintiff's left shoulder within normal
8  limits, her right shoulder within normal limits "aside from mild
9  undulating scoliosis," and "mild early degenerative disc disease
10  and bony spondylosis" at the thoracolumbar junction.   (AR 280-
11  82).

12

13     b.   Dr. Babak Zamiri

14

15     Babak Zamiri, M.D., a board-certified rheumatologist,
16  evaluated Plaintiff on July 14, 2009.   (AR 197).   Dr. Zamiri's
17  report noted that Plaintiff complained of pain in her shoulders
18  and hands.[6]   (Id.).   Dr. Zamiri interpreted Plaintiff's records
19  as showing a history of diabetes, depression, hyperlipidemia,
20  psoriasis and kidney stones.   (Id.).   Plaintiff showed no
21  fatigue, chest pain or shortness of breath.   (AR 198).   She did
22  not complain of nausea, vomiting, diarrhea, constipation, back
23  pain, numbness or tingling, and exhibited a generally good range
24  of motion in her neck and shoulders.   (Id.).

25

26

27  ────────────────
   [6]   "Arthralgia" means joint pain.   See Joint Pain, MEDLINEPLUS,
   http://www.nlm.nih.gov/medlineplus/ency/article/003261.htm (last
28  visited Sept. 22, 2014).

1    However, Dr. Zamiri observed that Plaintiff experienced pain
2 at sixteen of the eighteen "tender points" of fibromyalgia.[7]
3 (Id.).   Dr. Zamiri also confirmed Dr. Samaan's diagnosis of
4 polyarthralgia and diagnosed subacromial (shoulder) bursitis and
5 mild early osteoarthritis.   (Id.).   He opined that Plaintiff's
6 generalized musculoskeletal pain was "likely multifactorial
7 associated (sic) to fibromyalgia, osteoarthritis, and bursitis."
8 (AR 198-99).   He recommended a blood test, x-rays of the cervical
9 spine, shoulders and hand, and that Plaintiff "concentrate on
10 better management of depression, proper sleep, and proper
11 exercise."  (AR 199).   He informed Dr. Samaan that he might order
12 a "subacromial bursa injection" on Plaintiff's next visit, which
13 he scheduled for two weeks later.  (Id.).

14

15    On July 28, 2009, x-rays detected mild osteopenia (decreased
16 bone density) and mild degenerative disk disease at the C5-6
17 disk.  (AR 192-96).   Plaintiff returned to Dr. Zamiri's office on
18 September 29, 2009 and he again recorded impressions of
19 fibromyalgia, osteoarthritis, shoulder bursitis, and depression.
20 (AR 189).   He noted that Plaintiff reported "a lot of stress +
21 new pain" and that she was taking the following drugs: glyburide

22

23

24

---

25 [7]    When determining whether a patient has fibromyalgia, doctors
examine eighteen fixed locations ("points") on the body.  Doctors
26 press each point firmly to see if the patient flinches.
Generally, if a patient flinches after compression of eleven or
27 more points, she will be diagnosed with fibromyalgia.  See
Rollins v. Massanari, 261 F.3d 853, 863 (9th Cir. 2001).

28

1   with metformin; Avandia; enalapril with hydrochlorothiazide;

2   lovastatin; citalopram; Robaxin; and Darvocet.[8]  (Id.).

3

4          c.   Arrowhead Regional Medical Center

5

6          Plaintiff used Arrowhead Regional Medical Center

7   ("Arrowhead") as her primary care provider beginning in 2011.

8   (AR 365).  A "triage assessment" conducted on October 7, 2011,

9   reported that Plaintiff complained of body pain she put at level

10  six on a one-to-ten scale.  (AR 579, 584).  The assessment also

11  noted Plaintiff's diabetes and fibromyalgia diagnoses, recorded

12  Plaintiff's then-current medication regime, and indicated that

13  all eleven medications on the list were to be continued following

14  the assessment.  (AR 580, 582).  A similar assessment five days

15  later added Plaintiff's arthritis history, but appears to have

16  been scheduled mainly so that her glyburide prescription could be

17  renewed.  (AR 586-87).

18

19         On November 9, 2011, Plaintiff visited Arrowhead,

20  complaining of hand pain and dry skin.  (AR 590).  She placed her

21  pain at level eight on a one-to-ten scale.  (Id.)  Examining

22

23  [8] These drugs are used to treat the following conditions: type 2
    diabetes (glyburin with metformin; Avandia); high blood pressure
24  (enalapril with hydrochlorothiazide); serum cholesterol
    (lovastatin); depression (citalopram); muscle strain and
25  discomfort (Robaxin); and mild to moderate pain (Darvocet).  See
    MEDLINEPLUS,    http://www.nlm.nih.gov/medlineplus/druginfo/meds/
26  (locate "Browse by generic or brand name" and click first letter
    of drug name). Darvocet was withdrawn from the U.S. market in
27  2010.  See Acetaminophen and Propoxyphene, MEDLINEPLUS,
    http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601008.html.
28

                                    8

1   physician Anh Nguyen, M.D. diagnosed arthralgia in both hands and

2   also found Plaintiff's diabetes "out of control." (AR 592). Dr.

3   Nguyen noted that Plaintiff had been "out of meds" for four days,

4   and issued a new prescription for naprosyn.[9] (AR 591-92). At

5   Plaintiff's next visit to Arrowhead, on December 14, 2011, a

6   diagnosis of depression was added to her treatment record. (AR

7   598). An "outpatient note" dated approximately a month later, on

8   January 12, 2012, recorded Dr. Paladugu's depression diagnosis.

9   (AR 600). On March 2, 2012, a similar outpatient note confirmed

10  that Plaintiff was still being treated for bilateral hand pain,

11  fibromyalgia, hypertension, depression, allergies and diabetes,

12  and listed the medications Plaintiff had been prescribed for each

13  condition. (AR 601). On May 7, 2012, Plaintiff underwent

14  laboratory tests ordered by Geesnell Lim, M.D., at Arrowhead.

15  (AR 602-04). The report showed elevated glucose and alkaline

16  phosphatase levels.[10] (AR 603). Finally, on May 14, 2012, the

17  final outpatient note again showed diagnoses of bilateral hand

18  pain, fibromyalgia, hypertension, depression and diabetes and

19  added hot flash symptoms. (AR 605). Dr. Lim ordered a follow-up

20  visit related to Plaintiff's fibromyalgia for eight weeks later.

21  (Id.).

22

23

---

24  [9]   It is not clear from Dr. Nguyen's treatment record whether
25  Plaintiff was out of all or only some of her medications, or to
    which conditions these prescriptions pertained.
26  [10]   An alkaline phosphatase ("ALP") test is normally ordered to
27  check liver function. However, high ALP levels may also be
    associated with certain bone conditions and cancers. ALP - blood
28  test, MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/ency/article/
    003470.htm (last visited Sept. 23, 2014).

1    **2.   Mental Condition**

2

3         a.   Dr. Geetha Paladugu

4

5         Plaintiff saw psychiatrist Geetha Paladugu, M.D., on April

6    6, 2009. (AR 225). Dr. Paladugu found Plaintiff's affect

7    appropriate but her mood depressed. (AR 227). According to Dr.

8    Paladugu's treatment note, Plaintiff reported depression "off and

9    on over the past 5 years," and that she was "not doing well over

10   the past 7 months." (AR 225). Plaintiff's memory, judgment, and

11   thought process were intact. (AR 227). Dr. Paladugu recorded

12   that Plaintiff was experiencing "moderate" depression, sleep

13   disturbance, agitation or irritability, guilt and crying spells,

14   as well as moderately poor concentration and mild anxiety. (AR

15   225). She noted that Plaintiff was "tearful" during the

16   appointment. (AR 227). Dr. Paladugu estimated that Plaintiff's

17   behavioral problems would cause "severe" impairment of her

18   ability to function at work or in a relationship with a spouse or

19   partner, as well as "moderate" impairment of her other primary

20   relationships and her physical health. (Id.) She prescribed

21   Celexa and Neurontin.[11] (Id.)

22

23        On May 1, 2009, Plaintiff again visited Dr. Paladugu,

24   describing herself as "overwhelmed" and anxious, though with

25   _____

26   [11]   Celexa, described above by its generic name citalopram, is
     an antidepressant. Neurontin may be used to treat seizures but,
27   in patients with diabetes, is typically used to treat nerve
     damage associated with the disease. See Citalopram & Gabapentin,
28   MEDLINEPLUS, http://www.nlm.nih.gov/medlineplus/druginfo/meds/htm.

"good and bad days." (AR 224). She mentioned her shoulder and wrist problems. (Id.). On June 5, 2009, Plaintiff told Dr. Paladugu that she was experiencing pain in her neck, shoulders, and hands and spasms in her back, and her mood was "not good." (AR 223). Her sleep "could be better" and her motivation was low, but her memory was "okay" and she was not experiencing delusions or thoughts of hurting herself or others. (Id.). On July 17, 2009, Plaintiff visited Dr. Paladugu again, now describing herself as "worrying a lot," easily agitated, and not sleeping well. (AR 222). Plaintiff reported that she had stopped taking Neurontin and that she was "being started on Lyrica," a fibromyalgia drug. (Id.).

On August 7, 2009, Plaintiff's next consultation with Dr. Paladugu, Plaintiff reported that she was "overwhelmed" because her "s.o." had been in the hospital for twenty days. However, her son had moved home "to help out."[12] (AR 221). The following month, on September 11, 2009, Plaintiff's "s.o." had at last been released from the hospital and come home, but he faced a lung transplant and Plaintiff's mood was "low." (AR 220). The situation had deteriorated on October 7, 2009, when Plaintiff was "overwhelmed." (AR 219). By February 1, 2010, Mr. Marroquin was again at home but "very sick," and Plaintiff's aunt had also died. (AR 217). Plaintiff described her sleep and appetite as having "good and bad days" and her energy and motivation as

---

[12] The Court understands "s.o." to refer to Plaintiff's "significant other," Carlos Marroquin, whose Third Party Report is discussed below.

1    erratic.   (Id.).   Her mental condition continued to fluctuate

2    between April 19, 2010 and August 4, 2011.   (AR 574-77).

3

4    **B.   Consultative   Opinions   Regarding   Plaintiff's   Physical**

5    **Condition**

6

7       **1.   Dr. Vicente R. Bernabe**

8

9       On October 17, 2012, following the initial remand, Vicente

10   R. Bernabe, D.O., a board-certified orthopedic surgeon, performed

11   an examination of Plaintiff.   (AR 532-44).   Dr. Bernabe's summary

12   report, dated October 31, 2012, noted that he did not review

13   Plaintiff's medical records, but was aware of Plaintiff's

14   diagnoses of osteoarthritis of the spine, fibromyalgia and

15   diabetes.   (AR 539-40).   He reported that Plaintiff continued to

16   have "a throbbing, burning pain in her neck, upper back, lower

17   back that radiates to her shoulders, elbows, knees, wrists, hands

18   and feet."   (AR 540).   He also noted Plaintiff's claim that her

19   pain "is exacerbated by prolonged lifting, bending, walking and

20   sitting."

21

22      Although Dr. Bernabe's report stated that "[c]urrently, the

23   only treatment [Plaintiff] is receiving is pain medications," it

24   also listed, on the same page, ten medications Plaintiff was then

25   taking at least once daily.   (Id.)   These included

26   hydrochlorothiazide, Maxalt, metformin, tramadol, enalapril,

27

28

citalopram,    carisoprodol,    amitriptyline,    glyburide    and
loratadine.[13]   (Id.).

Dr. Bernabe observed that Plaintiff could sit and stand with
normal posture, sat comfortably during the examination and rose
from a chair without difficulty, and could also get on and off
the examination table without difficulty.  (AR 541).  He found
that there was tenderness to palpation throughout the thoracic
and lumbar area, but no scoliosis.  (Id.).  He found no deformity
or impaired range of motion in the spine, but noted tenderness at
the base of the skull and "at the posterior spinous process."
(Id.).  He found Plaintiff's range of motion within normal limits
throughout her upper and lower extremities.  (AR 542).

Dr. Bernabe diagnosed Plaintiff with degenerative disease of
the cervical and thoracic spine, as well as with cervical,
thoracic and lumbar musculoligamentous and myofascial strain.
(AR 543).  However, he concluded that Plaintiff should be able to
carry twenty-five pounds frequently and fifty pounds
occasionally, and either sit or stand and walk six hours out of
an eight-hour day.  (AR 543).  He found no manipulative or
postural limitations and opined that Plaintiff should be able to
push or pull "on a frequent basis."  (AR 544).

---

[13]   According to the National Institutes of Health, these drugs
are used to treat the following conditions: high blood pressure
(hydrochlorothiazide, enalapril); migraine headaches (Maxalt);
moderate to severe pain (tramadol); type 2 diabetes (metformin,
glyburide); depression (citalopram, amitriptyline); muscle pain
(carisoprodol); hay fever (loratadine).  See MEDLINEPLUS,
http://www.nlm.nih.gov/medlineplus/druginfo/meds/ (locate "Browse
by generic or brand name" and click first letter of drug name).

1          **2.   Dr. Sandra Eriks**

2

3          Sandra M. Eriks, M.D., a board-certified internist,

4    performed an internal medicine examination of Plaintiff.  (AR

5    547).  In her summary report, dated November 6, 2012, Dr. Eriks

6    noted that Plaintiff complained of "rather diffuse body pain,"

7    particularly in the lower back, shoulder and back of the neck, as

8    well as "throughout the spine and the anterior chest area."  (AR

9    547-48).  Dr. Eriks indicated that she had a note "from the

10   physician who diagnosed [Plaintiff] with [fibromyalgia]" in July

11   2009, presumably Dr. Zamiri, stating that Plaintiff needed to

12   take Robaxin and Lyrica.  (Id.).  However, Plaintiff told Dr.

13   Eriks that she disliked taking both medications and believed

14   Lyrica had caused her to break out in a rash.  (AR 547-48).

15

16          Dr. Eriks found Plaintiff in "no apparent distress," but

17   noted "marked cutaneous hypersensitivity" at the chest, abdomen

18   and back and throughout the extremities.  (AR 549-50).  She found

19   that Plaintiff had a full range of motion in all extremities and

20   good grip strength.  (AR 550).  Despite Plaintiff's reported back

21   and neck pain, Dr. Eriks found Plaintiff's neck and back motion

22   within normal limits.  (AR 551).  Dr. Eriks observed that

23   Plaintiff exhibited "exquisite cutaneous hypersensitivity in

24   every area touched" with a "very, very light fingertip" but did

25   not complain of pain when examined with a stethoscope.  (Id.).

26   This, combined with Plaintiff's failure to "spontaneously" report

27   fatigue, morning stiffness or non-restorative sleep, led Dr.

28   Eriks to conclude that Plaintiff did not have fibromyalgia.

(<u>Id.</u>).    Rather,  on  the  basis  that  Plaintiff  appeared  to  be
"magnifying  her  symptomology"  and  "relatively  uncooperative"
during  the  examination,  Dr.  Eriks  concluded  that  "malingering  is
present."  (<u>Id.</u>).  Dr.  Eriks  opined  that  Plaintiff  should  be  able
to  lift  and  carry  fifty  pounds  frequently  and  100  pounds
occasionally,  as  well  as  to  stand  or  walk  for  six  hours  out  of  an
eight-hour  workday.   (<u>Id.</u>).

**C.    <u>Consultative  Opinions  Regarding  Plaintiff's  Mental  Condition</u>**

   **1.    Dr.  Gadson  Johnson**

      On  October  17,  2009,  consulting  physician  Gadson  Johnson,
M.D.,  conducted  a  psychiatric  evaluation  of  Plaintiff.   (AR  200-
203).    Dr.  Johnson  stated  that  Plaintiff's  medical  and
psychiatric  records  were  unavailable,  but  he  was  aware  that
Plaintiff  had  been  examined  by  Dr.  Paladugu.   (AR  200-201).  He
noted  that  Plaintiff  complained  of  depression,  crying  spells  and
trouble  sleeping  in  addition  to  her  physical  symptoms,  but  denied
suicidal  or  homicidal  thoughts.   (AR  200).    Plaintiff  described
herself  as  being  able  to  eat,  dress  and  bathe  on  her  own,  do  some
household  chores,  errands,  shopping  and  cooking,  and  get  along
with  others.   (AR  201).    She  was  calm  and  cooperative  but
depressed,  with  an  affect  appropriate  to  her  mood.   (AR  202).
Dr.  Johnson  found  no  cognitive  deficits,  perceptual  disturbances,
or  memory  problems  and  opined  that  Plaintiff  could  tolerate  "the
stress  inherent  in  the  work  environment"  and  could  work  without

supervision.  (AR 203).  However, he judged Plaintiff's prognosis to be only "fair."  (Id.).

### 2.   Dr. Douglas W. Larson

Douglas W. Larson, Ph.D., a psychologist, conducted a further psychological examination of Plaintiff on November 7, 2012, after the present case was remanded but before Plaintiff testified before the Second ALJ.  (AR 561-69).  Dr. Larson judged Plaintiff "reasonably reliable as a historian" and noted that a staff member had to help her fill out a questionnaire due to pain in Plaintiff's hands.  (AR 564).  He described Plaintiff's complaints as including depression, anxiety, confusion, unexplained fits of anger, fatigue, "transient" suicidal thoughts and problems with concentration.  (Id.).

Dr. Larson reported that Plaintiff could drive, shop, pay bills, do "a few" chores, interact with her family, read the newspaper and watch television, but that some of her activities -- including dressing, bathing, cooking, household chores and yard work -- were impaired due to her pain.  (AR 565-66).  He found Plaintiff to be pleasant, cooperative, and neatly groomed but also depressed, and noted that Plaintiff cried occasionally while describing her problems.  (AR 566).  He found her concentration and "fund of knowledge" variable and her insight and judgment "[f]air, in that she is seeking treatment for her problems." (Id.).  Based on a number of standardized tests, Dr. Larson found Plaintiff's memory deficient and her cognitive functioning

"decreased . . . probably secondary to her pain and pain medication, as well as her depression." (AR 567-68).

Specifically, Dr. Larson evaluated Plaintiff's performance on the Wechsler Adult Intelligence Scale (WAIS-IV) test as "significantly scattered from the deficient to low average range, generally consistent with her history of multiple problems." (AR 566-67). Similarly, Plaintiff showed results scattered from "deficient" to "borderline" range on the Wechsler Memory Scale IV test. (AR 567). Dr. Larson termed Plaintiff's mental health prognosis "unknown and probably dependent on her response to treatment." (AR 568). With respect to her ability to work, Dr. Larson found Plaintiff's ability to handle complex commands, interact with supervisors, coworkers and the public, comply with job rules, and respond to change in the normal workplace setting "moderately impaired." (AR 569). Plaintiff could handle simple commands, but was "markedly impaired" in her ability to maintain persistence and pace in a normal workplace setting. (Id.).

**D.**   **Non-examining Physicians' Opinions Regarding Plaintiff's Physical Condition**

**1.   Dr. C.C. Scott**

On September 15, 2009, non-examining state agency physician C.C. Scott, M.D., completed an RFC physical assessment based on

1   Plaintiff's records from Dr. Zamiri.[14]  (AR 215).  After reviewing
2   Plaintiff's descriptions of her medical conditions and daily
3   activities as well as Dr. Zamiri's treatment, Dr. Scott concluded
4   that Plaintiff's allegations were "partially credible."  His sole
5   additional note was that "clmt has trigger pts and sx of
6   fibromyalgia and ddd."[15]  (AR 216).

8       **2.   Dr. L.C. Chiang**

10      L.C. Chiang, M.D., a second non-examining state agency
11  physician, completed an additional RFC physical assessment on
12  February 16, 2010.  (AR 274-75).  This later assessment was based
13  on records sent by Dr. Zamiri and on Plaintiff's psychiatric
14  evaluations.  (AR 274).

---

22  [14]   It is unclear why Dr. Scott's assessment failed to take into
23  account the records of Plaintiff's primary care physician, Dr.
    Samaan, who had been treating Plaintiff since 2004.  Dr. Scott
24  also left the Administration's RFC assessment form, which asks
    specific questions about claimants' physical limitations and
25  symptoms, almost entirely blank.  (AR 183-88).  Nevertheless, the
    accompanying Case Analysis form directs readers to "See RFC" for
26  questions and recommendations.  (AR 216).  Dr. Scott's evaluation
    was apparently affirmed on November 12, 2009 by an individual who
27  signed the Case Analysis form as N. Yunak.  (Id.)
    [15]   The Court understands "sx" to mean "symptoms" and "ddd" to
28  stand for "degenerative disk disease."

18

**E.   Non-examining Physicians' Opinions Regarding Plaintiff's Mental Condition**

**1.   Dr. L.C. Chiang**

The second state agency Case Analysis, which Dr. Chiang prepared on February 16, 2010, reviewed records submitted by Drs. Paladugu and Johnson.  (AR 274).  Either Dr. Chiang or Dr. Sidney Gold, who also signed the Case Analysis, concluded that these sources "[did] not demonstrate any evidence contrary to what was previously reviewed."  (AR 275).

**F.   Vocational Expert Testimony**

**1.   Vocational Expert Troy Scott's Testimony At The First ALJ Hearing**

Vocational Expert ("VE") Troy Scott testified at the First ALJ Hearing regarding Plaintiff's work history and the existence of jobs that Plaintiff could perform given her physical and mental limitations.  (AR 40-44).  The VE noted that Plaintiff had a "past relevant work" history as an office manager and preschool teacher's aide.[16]  (AR 42).  He opined that Plaintiff would not be capable of performing any of her past relevant work, and her previous skills would not be transferable to other jobs.  (AR 42-

---

[16]   Based on the VE's testimony, the First ALJ ruled that Plaintiff's additional prior occupation -- working for a collections and automobile repossession concern -- did not meet the criteria for "past relevant work."  (AR 41-42).

43).  However, the VE opined that an individual with Plaintiff's education, skills, and physical limitations could perform certain unskilled jobs requiring minimal exertion.  (AR 43).  Examples included employment as an electronic worker, sewing machine operator, or packing machine operator.  (Id.)  However, neither these nor comparable jobs would be available to Plaintiff if she had to be "off task" twenty percent of the time due to depression, pain, or side effects from her medications.  (Id.).  The VE also opined that Plaintiff could not work at any of these jobs if she were absent three or more days a month.  (AR 43-44).

> **2.  Vocational Expert Joseph Torres's Testimony At The Second ALJ Hearing**

Vocational Expert Joseph Torres testified at the Second ALJ Hearing.  (AR 385-95).  Mr. Torres identified three jobs as Plaintiff's "past relevant work": collections clerk, insurance office manager, and teacher's aide.  (AR 390).  The VE opined that an individual with Plaintiff's education, skills, and physical limitations would be unable to perform any of Plaintiff's past relevant work.  (AR 390-91).

The Second ALJ then posed two hypotheticals to Mr. Torres.  (AR 391 & 393).  The first largely repeated the hypothetical posed by the First ALJ, and Mr. Torres opined that Plaintiff would not be able to perform any of her past relevant work if her abilities matched those of the individual described.  (AR 391).  However, the VE reasoned that Plaintiff would be able to work as

a packer, housekeeper, or small products assembler.  (AR 391-92).
The Second ALJ then modified the hypothetical, asking the VE to
assume that the individual carried ten-pound objects only
occasionally and walked two hours out of every eight, rather than
six hours.  (AR 392).  Once again, the VE opined that the
Plaintiff would not be able to perform any of her past relevant
work.  (AR 392-93).  However, the VE concluded that even with
these reduced physical capabilities, Plaintiff would be able to
work as an assembler or table worker.  (AR 393).  In response to
a further question from Plaintiff's counsel, the VE concluded
that none of the identified jobs would be available to Plaintiff
if she required unscheduled breaks totaling four hours over
several weeks, or if she were absent from work "a day a week or
four or more days out of the month."  (AR 394).

**G.   Plaintiff's Testimony**

**1.      Testimony Before the Second ALJ**

At her hearing before the Second ALJ on March 27, 2013,
Plaintiff testified that she ceased work at a preschool because
"it was just too painful to work."  (AR 356-57).  Plaintiff
stated that she had "a lot of pain in my hands, my back, all
over" and that she sometimes began crying in the morning before
leaving for work.  (AR 357-58).  Following her diagnosis with
fibromyalgia and arthritis, Plaintiff's physicians began treating
her with "different medications" that caused allergic reactions.
(AR  358)    They  also  referred  her  to  Dr.  Paladugu,  the

1  psychiatrist, "because I was having a lot of anxiety and a lot of

2  depression."  (Id.)

3

4      At the time of her hearing, Plaintiff was still experiencing

5  symptoms of mental illness.  (AR 361-68).  Plaintiff said she did

6  not like to leave her room "for weeks" because she "felt safe in

7  there."   (AR 363-64).   She could be "feeling fine" and yet

8  suddenly begin to cry, and felt anxious all the time.  (AR 362).

9  Plaintiff took a muscle relaxer, a painkiller, and a sleeping

10 pill but was sometimes unable to sleep.  (AR 362-63).  At times,

11 she was unable to find ordinary items in her own kitchen, and

12 experienced memory loss.  (AR 363-64).  She continued to take

13 Celexa for anxiety, but still experienced uneasiness.  (AR 365-

14 66).  Despite these symptoms, however, she no longer saw a mental

15 health professional because her divorce left her uninsured.  (AR

16 364-65).

17

18     The Second ALJ then asked Plaintiff to describe her

19 fibromyalgia symptoms.  (AR 369).  Plaintiff responded that she

20 had "a lot of pain in my neck, my shoulders.  It goes up into my

21 head, especially in the back."  (AR 370).  She described being

22 unable to hold her hands over her head to wash her hair, and

23 shooting pains in her fingers.  (Id.).  Plaintiff stated that her

24 fibromyalgia was treated only with medications, though her doctor

25 had suggested she walk on days when she felt able to do so.  (AR

26 371).   She was currently taking pain relievers and a muscle

27 relaxant, having experienced allergic reactions to other

28

fibromyalgia drugs, including Lyrica. (AR 372-73). She was not taking any medications for her back or hand pain. (AR 373).

The Second ALJ asked Plaintiff to describe an "average day." (AR 374). In response, Plaintiff said that "on a good day" she would make her bed, straighten the house, sit on her patio, and sometimes go to a market or prepare dinner. (AR 374). She could watch television and take the dog out, but her hand pain prevented her from turning pages if she tried to read for any length of time. (Id.). She sometimes went to church, but was unable to kneel to pray. (AR 375, 384). Her back did not hurt at all on some days, and she could usually sit for an hour. (AR 375-76). However, on other days her back hurt so much that Plaintiff had to lie down.[17] (AR 375). On a bad day, Plaintiff could not get out of bed at all. (AR 379). She estimated that she was confined to bed approximately ten days per month, and had not experienced a month with fewer than ten "bad days" since she had stopped working. (AR 380-81).

### 2.    Statements On Plaintiff's Benefits Application

In the Disability Report accompanying Plaintiff's Benefits Application, Plaintiff listed the illnesses limiting her ability to work as fibromyalgia, depression, and diabetes. (AR 134). She described migraine headaches and pain in her neck, shoulders,

---

[17]    In response to a question from her attorney, Plaintiff clarified that her ability to carry out household activities and sit for an hour pertained to "good days". On "bad days," however, she was unable to get out of bed. (AR 379).

arms and hands.  (Id.).  She described the crying spell that first caused her to seek treatment.  (Id.).  She reported that she was sometimes unable to write for more than a few minutes or to do household chores.  On other days, she could not get up at all, due to arthritis pain and back stiffness.  (Id.).  She also reported ongoing fatigue, depression, mood swings and difficulty sleeping.  (Id.).

Plaintiff described having "good days and bad days."  (AR 151).  On a "good day," she could shower, prepare simple meals, and do household chores if she took "many breaks."  (Id.).  However, she noted that she was sometimes unable to sleep, drive, do household chores, or "go out be myself (sic)."  (AR 152).  Her hobbies were reading, needlepoint, and other crafts, but she was unable to pursue any of them, with the exception of reading the newspaper.  (AR 155).  She described herself as having been "a very happy and outgoing person" before her illnesses, but fearful that "I will not be the way I was."  (AR 157).

H.   **Carlos Marroquin's Third Party Function Report**

On August 27, 2009, Plaintiff's boyfriend, Carlos Marroquin, completed a Third Party Function Report.  (AR 143-150).  He explained that he had known Plaintiff for fifteen years and lived with her for the past two.  (AR 143).  In his description of Plaintiff's daily activities, Mr. Marroquin wrote that Plaintiff was able to shower, clean the house "as much as she can" and cook light meals, but "most of the time she is in pain."  (Id.).  She

24

had been forced to abandon her former hobbies of arts, crafts, and sewing. (AR 147). She had no problems with hygiene or personal grooming, however, and was able to drive. (AR 144, 146). Once or twice per week, Plaintiff shopped for groceries or clothes, and she spoke on the telephone daily. (AR 147). However, Plaintiff had difficulty socializing because "she is very emotional, a lot of pain [sic]" and because she was having "[a] hard time going places." (AR 148). Although Plaintiff got along well with authority figures, she could not handle stress or changes in routine very well. (AR 149). In response to a question about whether he had noticed unusual behavior or fears, Mr. Marroquin said Plaintiff "[woke] up in pain at nights [sic] crying, mood swing[s]." (Id.).


## IV.

### THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS


To qualify for disability benefits, "a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity and that is expected to result in death or to last for a continuous period of at least twelve months." Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant "incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy." Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

25

To determine whether a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps and their related inquiries are as follows:

    (1) Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

    (2) Is the claimant's impairment severe? If not, the claimant is found not disabled. If so, proceed to step three.

    (3) Does the claimant's impairment meet or equal one of the specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, the claimant is found disabled. If not, proceed to step four.

    (4) Is the claimant capable of performing his past work? If so, the claimant is found not disabled. If not, proceed to step five.

    (5) Is the claimant able to do any other work? If not, the claimant is found disabled. If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520(b)-(g)(1) & 416.920(b)-(g)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five.

Bustamante, 262 F.3d at 953-54.   Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry.   Id. at 954.   If, at step four, the claimant meets her burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity ("RFC"), age, education, and work experience. Tackett, 180 F.3d at 1099, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).   The Commissioner may do so by taking testimony from a vocational expert or by reference to the Medical-Vocational Guidelines in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids").   Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001).   When a claimant has both exertional (strength-related) and non-exertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert.   Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000) (citing Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)).

## V.

### THE SECOND ALJ'S DECISION

The Second ALJ incorporated the First ALJ's decision by reference in her April 5, 2013 decision.[18]   The ALJ employed the

---

[18]   The Second ALJ specifically incorporated the summaries and analysis of the prior decision, but not its conclusions.   (AR 326).   She noted that she would only reference medical exhibits from the earlier proceeding when they were relevant.   (Id.).

five-step sequential evaluation process and concluded that Plaintiff was not under a disability within the meaning of the Social Security Act from June 1, 2008, through the date of her decision. (AR 327).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful employment since July 1, 2008. (AR 328). At step two, she found that Plaintiff had the severe impairments of type 2 diabetes, bilateral hand arthralgia, degenerative disc disease of the cervical and thoracic spine, cervical, thoracic and lumbar musculoligamentous and myofascial strain, left subacromial bursitis, cognitive disorder, and depressive disorder. (AR 328); see also 20 C.F.R. §§ 404.1520(c) & 416.920(c). However, the ALJ reasoned that Plaintiff's history of obesity, hypertension, chronic headaches, psoriasis, hyperlipidemia and mild osteopenia, while medically determinable, did not establish "severe" impairment.[19] (AR 329-30). Moreover, the ALJ concluded that Plaintiff did not meet the three criteria required to establish fibromyalgia as a medically determinable impairment: a physician's diagnosis, conformity with either the 1990 or 2010 American College of Rheumatology criteria for the disease, and consistency with other evidence in the case record. (AR 330); see also SSR 12-2p, 2012 WL 3104869 (July 25, 2012).

---

This discussion will refer to the Second ALJ as "ALJ" except where necessary for clarity.

[19]   A physical or mental impairment is considered "severe" if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520.

1    At step three, the ALJ found that Plaintiff did not have an
2  impairment or combination of impairments that met or medically
3  equaled one of the listed impairments in 20 C.F.R. Part 404,
4  Subpart P, Appendix 1).  (AR 330-32).  The ALJ also reasoned that
5  Plaintiff's mental impairments, "considered singly and in
6  combination, do not meet or medically equal the criteria of
7  listings 12.02 and 12.04."[20]  (AR 331).  The ALJ then found that
8  Plaintiff had the following RFC:

9

10       [Plaintiff] has the residual functional capacity to
11       perform light work as defined in 20 C.F.R. 404.1567(b)
12       and 416.967(b).  Specifically, she can lift 20 pounds
13       occasionally and 10 pounds frequently.  She can stand
14       and walk for six hours out of an eight-hour workday,
15       and sit for six hours out of an eight-hour workday.
16       She can occasionally push and pull with the left upper
17       extremity.  She can occasionally perform work overhead
18       with her bilateral upper extremities.  She can
19       occasionally climb ramp and stairs, balance, stoop,
20       kneel, crouch and crawl.  She cannot climb ladders or
21       scaffolds, nor can she work at heights.  She cannot
22       perform forceful twisting, turning, or grasping with
23       her bilateral hands.  She is limited to simple,
24       repetitive tasks.  She should be in a habituated
25       setting with little workplace changes.  She can have

26

27  [20]  Listing 12.02 describes organic mental disorders.  Listing
28  12.04 describes affective disorders.  20 C.F.R. Pt. 404, Subpt.
    p, App. 1.

1    occasional, non-intense contact with coworkers and

2    supervisors, but no contact with the general public.

3

4  (AR 332).  In reaching this finding, the ALJ stated that she had

5  considered all of Plaintiff's symptoms and the extent to which

6  they could "reasonably be accepted as consistent with the

7  objective medical evidence and other evidence." (Id.).  She also

8  considered opinion evidence. (Id.).

9

10     The ALJ found Plaintiff's subjective allegations "less than

11  fully credible." (AR 333).  She opined that Plaintiff's claims

12  as to the severity of her symptoms were "greater than expected"

13  given the objective medical evidence, including a record of

14  "generally . . . benign objective findings, other than the

15  claimant's subjective complaints of pain or tenderness." (Id.).

16  A "lack of aggressive treatment" further called Plaintiff's

17  credibility into question, and no statement from an examining or

18  treating physician "endorse[d] the extent of [Plaintiff's]

19  alleged functional limitations." (Id.).  The ALJ reasoned that

20  Plaintiff "consciously attempted to portray limitations that are

21  not actually present" in order to obtain benefits, and twice

22  noted Dr. Eriks's suspicion that Plaintiff was "malingering."

23  (AR 333-34, 335).  Nevertheless, despite devoting considerable

24  attention to Dr. Eriks's opinion, the ALJ asserted that she was

25  giving it "less weight," and assuming instead that Plaintiff's

26  complaints of pain and use of medications suggested "greater

27  limitations." (AR 336).

28

1    Similarly, while noting that Dr. Larson had tested

2 Plaintiff's cognitive functioning and assessed her as depressed,

3 the ALJ stated that Dr. Larson's findings deserved "significant

4 but not full weight." (AR 337). She also adjudged Mr.

5 Marroquin's third-party report only "partially credible" because

6 he was not a medical professional, and because he had a "romantic

7 and possibly financial interest in seeing [Plaintiff} receive

8 benefits." (AR 334).

9

10    At step four, the ALJ determined that Plaintiff was unable

11 to perform any of her past relevant work as defined by 20 C.F.R.

12 §§ 404.1565 and 416.965. (AR 338). However, based upon the

13 testimony of VE Joseph Torres, and considering Plaintiff's age,

14 education, work experience and RFC, the ALJ opined that Plaintiff

15 could perform jobs that existed in significant numbers in the

16 national economy. (AR 338-39). These included sedentary,

17 unskilled work as an assembler or table worker. (AR 338). In

18 sum, the ALJ found that Plaintiff was not under a disability as

19 defined by 20 C.F.R. §§ 404.1520(g) or 416.920(g). (AR 339).

20

21                              **VI.**

22                       **STANDARD OF REVIEW**

23

24    Under 42 U.S.C. § 405(g), a district court may review the

25 Commissioner's decision to deny benefits. "The court may set

26 aside the Commissioner's decision when the ALJ's findings are

27 based on legal error or are not supported by substantial evidence

28 in the record as a whole." <u>Aukland v. Massanari</u>, 257 F.3d 1033,

1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen
v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v.
Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

"Substantial evidence is more than a scintilla, but less
than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson
v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)). It is "relevant
evidence which a reasonable person might accept as adequate to
support a conclusion." Id.   To determine whether substantial
evidence supports a finding, the court must "'consider the record
as a whole, weighing both evidence that supports and evidence
that detracts from the [Commissioner's] conclusion.'" Aukland,
257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th
Cir. 1993)). If the evidence can reasonably support either
affirming or reversing that conclusion, the court may not
substitute its judgment for that of the Commissioner. Reddick,
157 F.3d at 720-21 (citing Flaten v. Sec'y, 44 F.3d 1453, 1457
(9th Cir. 1995)).

## VII.

### DISCUSSION

Plaintiff challenges the ALJ's decision on three grounds.[21]
First, Plaintiff contends that the ALJ failed to properly
consider relevant medical evidence, in particular evidence
related to Plaintiff's fibromyalgia and mental health.
(Memorandum in Support of Complaint ("MSC") at 4).   Second,

---

[21]   References to the "ALJ" in this Discussion will refer
exclusively to the ALJ on remand, Margaret Craig.

1   Plaintiff contends that the ALJ discounted Plaintiff's subjective
2   testimony without specifying why it lacked credibility.  (MSC at
3   10-14).   Third,  Plaintiff  contends  that  the  ALJ's  selective
4   deemphasis of certain objective findings -- in particular by Dr.
5   Larson -- and failure to credit Plaintiff's testimony resulted in
6   an erroneous determination of Plaintiff's residual functional
7   capacity.  (MSC at 15-16).

8

9        This Court agrees with Plaintiff's contentions.  First, the
10  decision below overlooked certain medical evidence that tended to
11  substantiate Plaintiff's claims.   In particular, medical records
12  related to Plaintiff's fibromyalgia diagnosis were not addressed.
13  Next, the decision below did not consider the entire record
14  regarding Plaintiff's daily activities.   Finally, the decision
15  did not provide clear and convincing reasons for rejecting
16  Plaintiff's subjective testimony about her pain or objective
17  evidence of her mental health status.   The ALJ's failure to
18  credit subjective and objective evidence establishing Plaintiff's
19  disability requires the Court to remand this case for an award of
20  benefits.   Garrison v. Colvin, 759 F.3d 995, 1019-20 (9th Cir.
21  2014).

22

23  A.   **Substantial Evidence Substantiated Plaintiff's Fibromyalgia**
24       **And Mental Illness Claims**

25

26       Social Security regulations require the Agency to "evaluate
27  every medical opinion we receive," giving more weight to evidence
28  from a claimant's treating physician.   20 C.F.R. § 404.1527(c).

Where the Agency finds the treating physician's opinion of the nature and severity of the claimant's impairments well-supported by accepted medical techniques, and consistent with the other substantive evidence in the record, that opinion is ordinarily controlling. 20 C.F.R. § 404.1527(c)(2); Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007). See also Garrison, 759 F.3d at 1012 (citing Orn)(even when contradicted, treating or examining physician's opinion is owed deference, and often the "greatest" weight). Where a treating source is not given "controlling weight," the Agency must give "good reasons" for the deviation, as specified in its regulations. 20 C.F.R. § 404.1527(c)(2); Garrison, 759 F.3d at 1012 & n.11. "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." Garrison, 759 F.3d at 1012-13 (citing Nguyen v. Chater, 100 F.3d 1462, 1464 (9th Cir. 1996)). Moreover, an ALJ must give "specific and legitimate" reasons for rejecting the findings of treating or examining physicians. Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995).

As a threshold matter, the decision below did not specifically discuss six years of treatment notes from Plaintiff's primary care physician, Dr. Samaan. (See AR 229-48, 279, 283-85, 294-301 & 315)."[22] (AR 332). Moreover, the decision

---

[22] The Court acknowledges that Dr. Samaan's treatment notes are difficult to decipher. However, the presence of "ambiguous"

34

below did not discuss records from Plaintiff's other treating physicians in detail. The decision also failed to give specific and legitimate reasons for according little weight to the assessments of some of the consultative physicians' opinions.

### 1.   Fibromyalgia Diagnosis And Evidence

The decision's assertion that Plaintiff "was once seen by a rheumatologist back in July 2009 who assessed [Plaintiff] for fibromyalgia" discounts the considerable body of evidence showing that Plaintiff suffers from fibromyalgia. (AR 330). As discussed above, Plaintiff saw Dr. Zamiri on at least two occasions more than two months apart, between which Dr. Zamiri ordered additional tests. AR 189-99. Dr. Zamiri confirmed his own initial impression of fibromyalgia at the second examination and communicated it to Plaintiff's primary care physician, Dr. Samaan. (AR 189, 197-99). One of the non-examining state agency physicians, Dr. C.C. Scott, confirmed that Plaintiff exhibited symptoms of fibromyalgia when he reviewed her medical records later in 2009. (AR 216). Most recently, Plaintiff's treating physicians at Arrowhead again confirmed her fibromyalgia diagnosis and continued her medications for this illness. (AR 581, 598, 600 & 605).

---

evidence is sufficient to trigger the ALJ's duty to fully and fairly develop the record, including by conducting an "appropriate inquiry." Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001). The Second ALJ's incorporation by reference of her predecessor's decision did not remedy this oversight, as the first ALJ also overlooked Dr. Samaan's treatment notes. (See AR 19, 326).

1    The Ninth Circuit has observed that fibromyalgia symptoms
2    are "entirely subjective." Jordan v. Northrop Grumman Corp.
3    Welfare Plan, 370 F.3d 869, 872 (9th Cir. 2004), overruled on
4    other grounds by Abatie v. Alta Health & Life Ins., 458 F.3d 955,
5    970 (9th Cir. 2006). "There are no laboratory tests for the
6    presence or severity of fibromyalgia," and "the only symptom that
7    discriminates between it and other syndromes and diseases is
8    multiple tender spots." Id. Thus, the finding that "claimant's
9    records do not reveal any other clinically documented signs of
10   fibromyalgia, other than headaches" (AR 300) does not recognize
11   the unique method of diagnosing fibromyalgia. (AR 330).

13   The Agency will find that a claimant has a medically
14   determinable impairment from fibromyalgia if she can make three
15   showings: a physician's diagnosis, conformity with either the
16   1990 or 2010 ACR criteria for the disease, and consistency with
17   other evidence in the case record. SSR 12-2p, 2012 WL 3104869,
18   at *2 (July 25, 2012). As noted above, Plaintiff's medical
19   records show fibromyalgia diagnoses by three physicians. Dr.
20   Zamiri confirmed that Plaintiff showed tenderness at sixteen of
21   the eighteen "tender points" associated with the disease -- five
22   more than the Agency's guidelines require.[23] Id. Plaintiff's
23   other diagnosed ailments, including a history of widespread pain
24   and repeated manifestations of fibromyalgia symptoms, signs, or
25   "co-occurring conditions" such as anxiety, depression and memory

---

[23]    Even if Plaintiff had not been able to satisfy the "tender
points" requirements outlined in the 1990 ACR criteria, her
records are consistent with the 2010 criteria. See SSR 12-2p,
2012 WL 3104869, at *3 (July 25, 2012).

impairment, are also consistent with a fibromyalgia diagnosis under the Agency's own guidelines. Id. at *3. No evidence in the record shows the existence of a condition other than fibromyalgia that explains Plaintiff's relevant symptoms. The ALJ's rejection of the substantial evidence of fibromyalgia was therefore improper.

### 2.  Mental Health

The decision assigned "significant but not full weight" to Dr. Larson's opinions, but failed to provide specific and legitimate reasons for this finding. (AR 337). Dr. Larson found Plaintiff "pleasant and cooperative, but depressed" and noted that she cried during their interview. (AR 566). He administered a battery of standardized cognitive and memory tests and found "decreased cognitive functioning," with poor memory scores and "marked limitations" in persistence and pace. (AR 569). Dr. Larson related Plaintiff's impairments to her inability to function in workplace situations. (AR 569). He found Plaintiff moderately or markedly impaired across her entire functional assessment, with the exception of her ability to handle simple commands. (Id.). Despite these tests, the decision faulted Dr. Larson for "uncritically" accepting Plaintiff's reported symptoms. (AR 337). This Court finds no evidence that Dr. Larson failed to factor his own observations and the objective results of his tests into his conclusions.

**B.** **The Decision Below Lacked Clear And Convincing Reasons To**
**Reject Plaintiff's Subjective Testimony And Credibility**

Plaintiff contends that the ALJ committed reversible error by failing to properly consider her subjective complaints. (MSC at 13). This Court agrees.

When assessing a claimant's credibility, the ALJ must engage in a two-step analysis. <u>Molina v. Astrue</u>, 674 F.3d 1104, 1112 (9th Cir. 2012). First, the ALJ must determine if there is medical evidence of an impairment that could reasonably produce the symptoms alleged. (<u>Id.</u>). If such evidence exists, the ALJ must make specific credibility findings in order to reject the claimant's testimony. (<u>Id.</u>). The ALJ may use "ordinary techniques of credibility evaluation" during this inquiry. <u>Smolen</u>, 80 F.3d at 1284. The ALJ may also consider any inconsistencies in the claimant's conduct and any inadequately explained or unexplained failure to pursue or follow treatment. <u>Tommasetti v. Astrue</u>, 533 F.3d 1035, 1039 (9th Cir. 2008). Additionally, the ALJ may use evidence of the claimant's ability to perform daily activities that are transferrable to the workplace to discredit her testimony about an inability to work. <u>Morgan v. Comm'r</u>, 169 F.3d 595, 600 (9th Cir. 1999).

At the first step of her credibility analysis, the ALJ acknowledged Plaintiff's illnesses but largely discounted their relationship to her alleged symptoms and impairments, regardless

of their severity.[24]   (AR 330-31).   The ALJ discounted Plaintiff's fibromyalgia diagnosis, as already discussed, and counted Plaintiff's mental impairments among those causing only "mild restriction" on her daily activities.   (AR 330-31).   However, Plaintiff reported that she could perform normal activities such as doing laundry, cooking simple meals, and going to church only on "good days" that never numbered more than approximately twenty per month.   (AR 374-75, 384).   On "bad days," never numbering fewer than approximately ten per month, she could not get out of bed at all.   (AR 379-80).   She suffered sudden crying spells even on "good" days and debilitating migraines that kept her bedridden.   (AR 382, 385).   She suffered memory loss that Dr. Larson confirmed.   (AR 363-64 & 567).

The ALJ rejected Plaintiff's credibility, asserting that Plaintiff "consciously attempted to portray limitations that are not actually present," despite the substantial evidence described above.   (AR 333).   To call a claimant's symptom testimony into question, however, the ALJ is required to "state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion."   Smolen, 80 F.3d at 1284.   The ALJ's decision does not identify the specific symptom testimony that is not credible or the facts in the record that lead to that conclusion.   (AR 333).

---

[24]   The ALJ acknowledged that the impairments she deemed "severe" -- diabetes, arthralgia, degenerative disc disease, cervical and lumbar strain, bursitis, cognitive disorder and depression -- affected Plaintiff "more than minimally," but then found that Plaintiff suffered only "mild" restriction in her daily activities.   (AR 330-31).

The ALJ pointed to Plaintiff's "poor effort with grip testing of the bilateral hands" as evidence of her alleged lack of cooperation. (Id.). However, this assertion is directly contradicted by Dr. Eriks, the consultative internist, who recorded "[g]rip strength is normal bilaterally." (AR 550). Similarly, the ALJ attempted to discount Dr. Larson's findings on the basis that Dr. Larson "did not have the opportunity to review the claimant's records." (AR 337). This assertion is contradicted by Dr. Larson's observation that "[t]here were several physician progress notes generally illegible . . . [that] appear to indicate problems with pain and depression, and [that Plaintiff] had been prescribed Celexa and Neurontin." (AR 564). Dr. Larson also noted that none of the notes indicated "problems with suicidal or homicidal ideation" and that a note dated February 1, 2010 "indicated sleep and appetite had good and bad days." (Id.).

Although the ALJ's decision asserts that Plaintiff's daily activities were allegedly inconsistent with those of an individual suffering from debilitating pain, the ALJ did not recognize all of the evidence regarding Plaintiff's limitations. (AR 333-34). An ALJ "must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." Garrison, 759 F.3d at 1016. The ability to perform ordinary household activities may be consistent with an inability to

function in the workplace.  *Id.*  Likewise, "it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment."  *Id.* at 1017.

The record does not support a conclusion of generally "benign objective findings."  A review of the entire record reveals eight years of treatment and medication for anxiety, depression, panic attacks, chronic type 2 diabetes, migraine headaches, and pain from fibromyalgia and arthritis, all diagnosed and treated by multiple physicians.  See *Aukland*, 257 F.3d at 1035.  Thus, Plaintiff's subjective testimony generally comports with the testimony of her treating doctors and the consultative physicians.

**C.   If Plaintiff's Subjective Testimony Were Credited As True And All The Other Evidence Were Given Proper Weight, Plaintiff Would Be Found Disabled, Necessitating The Award of Benefits**

The Court must ordinarily remand for an award of benefits where "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand."  *Garrison*, 759 F.3d at 1020 (citing, *inter alia*, *Lingenfelter*, 504 F.3d at 1041; *Orn*, 495 F.3d at 640;

41

1   _Smolen_, 80 F.3d at 1292).   The "credit-as-true" rule allows

2   courts the flexibility to remand for further proceedings, rather

3   than an award, only where the record as a whole "creates serious

4   doubt" that a claimant is disabled.   _Id._ at 1021.

5

6       Remand for benefits, under _Garrison_, is therefore

7   appropriate here.   The Court earlier remanded this case to the

8   Agency with instructions to develop the record more fully.   Two

9   VEs testified that the Plaintiff would be unable to maintain

10  either her previous relevant work or any job consistent with her

11  alleged RFC if she had to miss three or more days of work per

12  month.   (AR 33-34, 394).   Plaintiff plausibly alleged that her

13  multiple physical and mental illnesses kept her confined to her

14  bed approximately ten days per month.   (AR 379-80).   The Court is

15  satisfied that the record has been fully developed and further

16  administrative proceedings would serve no useful purpose, and

17  that if the discounted evidence were credited as true, Plaintiff

18  would be entitled to benefits.

19

20

21

22

23

24

25

26

27

28

42

**VIII.**

**CONCLUSION**

For the foregoing reasons, IT IS ORDERED that Judgment be entered REVERSING the decision of the Commissioner and REMANDING this case for the award of benefits. The Clerk of the Court shall serve copies of this Order and the Judgment on counsel for both parties.

DATED: October 10, 2014

_____
/S/
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

**NOTICE**

**THIS DECISION IS NOT INTENDED FOR PUBLICATION IN LEXIS/NEXIS, WESTLAW OR ANY OTHER LEGAL DATABASE.**